Maurice **JOHNSON**, an **Incompetent Minor, age 11 years, by Daisy Essex, his grandmother and next friend, a femme sole, Plaintiff,**

v.

E. H. **CRAWFIS**, **M.D., Supt. State Hospital of Arkansas, et al., Defendants.**

Civ. No. 2805.

United States District Court, E. D. Arkansas, W. D.

Jan. 28, 1955.

U. Simpson Tate, Dallas, Tex., Thad D. Williams, Little Rock, Ark., for plaintiff.

James L. Sloan, Asst. Atty. Gen. of Arkansas, for defendants.

TRIMBLE, Chief Judge.

On July 15, 1953, the Probate Court of Chicot County, Arkansas, entered the following order of committal:

"In the Matter of
  "Morice Johnson
    "Incompetent

      "Order of Committal
"This matter now presented to the Probate Court of Chicot County upon due and legal notice given, and upon the certificate of J. A. Thompson, M.D., a regularly licensed and practicing physician of Dermott, Arkansas, certifying that Morice Johnson is so suffering from mental disease or psychosis as to need hospitalization and that said person is dangerous to society and to nearest relatives; and upon oral testimony duly heard, from which it is found that said person is so suffering from mental disease or psychosis as to require medical treatment; and the State Hospital, Little Rock, Arkansas, being willing and equipped to give necessary treatment;

"It is, therefore, ordered and adjudged that the said Morice Johnson be taken by a qualified peace officer of Chicot County, Arkansas, and delivered to the State Hospital of the State of Arkansas for examination and treatment; and it is so ordered on this the 15 day of July, 1953.

  "(Signed) D. A. Bradham
  "Judge of the Probate Court"

On the second day after the order of Committal was made the Sheriff of Chicot County carried the incompetent minor to the State Hospital in Little Rock, Arkansas, and was told by the person in charge of receiving patients that the Negro patient could not be accepted for the reason that the hospital did not have sufficient facilities.

On May 8, 1954, through an attorney representing the incompetent minor, a renewal was made for admission to the State Hospital, and again admission was refused.

On May 15, 1954, the incompetent minor, by his grandmother and next friend, Daisy Essex, filed a complaint in this court against the Superintendent of the State Hospital of Arkansas and the five members of the State Hospital Board, each of said defendants being sued in his respective official capacity.

The jurisdiction of the court was invoked under Title 28, United States Code, Sections 1331, 1343, 2201, 2202 and 2281, and it was further alleged that plaintiff brought the action in his own behalf and as a representative of a class pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.

It appears further that it was the intention of the recitals of the complaint to bring into consideration by the court the question of whether there has been a violation of the 14th Amendment to the Constitution of the United States,* Section 1, and Title 8, United States Code, Section 41.

The complaint alleged that the plaintiff is among those persons classified as Negroes, and a citizen of the United States and the State of Arkansas, and a resident of Chicot County, Arkansas. That he is a minor 11 years of age; that he is suffering from a mental disease or psychosis, dangerous to society and his nearest relatives and that he had been ordered taken to the State Hospital at Little Rock, Arkansas, for examination and treatment. It was alleged that the plaintiff had been denied admission to the State Hospital on July 17, 1953, and May 8, 1954, and that such denial was contrary to the laws of Arkansas and in violation of the Constitution and laws of the United States; that there is no other state-owned and maintained hospital within the State of Arkansas where he can receive similar or equal medical care and treatment as are afforded minor incompetents who are non-Negroes at the State Hospital.

* Now 42 U.S.C.A. §§ 1981–1983.

Plaintiff alleged the establishment of the State Hospital of Arkansas for the care and management of the insane of the state and the due election and qualification of the defendants in their respective official capacities; and further that the State Hospital Board was created by the laws of Arkansas with power and authority to manage and control the State Hospital and make rules and regulations for the conduct of the institution and its patients.

Plaintiff alleged that the defendants, acting or purporting to act under power and authority vested in them by the laws of Arkansas, have made and are enforcing and executing rules and regulations and have adopted policies, practices, customs and usages and are enforcing and executing the same to the great harm and injury of the plaintiff and other minor Negro incompetents.

It was further alleged that the laws of the state make provision for the treatment, care and welfare of the citizens of the state who become mentally ill and in need of hospitalization, and that such law has declared that such citizens shall be admitted to the State Hospital for diagnosis, care and treatment.

The complaint further alleged that the Arkansas State Hospital embraces facilities devoted to the care and treatment of minor incompetents which are denied to the plaintiff and other Negro incompetents.

Based upon these allegations which have been abbreviated in the foregoing statement, plaintiff asked for the following relief:

(a) That the court enter a decree declaring the action of the defendants which denies on the basis of color or race the admission, treatment and care of the plaintiff, or any other Negro incompetent similarly situated, or which denies plaintiff and other minor incompetent citizens of the state similarly situated their privileges and immunities and equal protection of the laws, to be held to be unconstitutional and void.

(b) That the court enter a decree declaring the action of the defendants in adopting, enforcing or executing any policy, practice, custom or usage pursued against the plaintiff or any other minor Negro incompetent citizen of the state, which excludes them from being admitted to and receiving treatment and care at the same time and under the same terms and conditions as all other mentally incompetent citizens of the state are admitted, treated and cared for, be held to be unconstitutional and void.

(c) That the court enter a decree declaring the action of the defendants in making any distinction in the admission, care and treatment on the basis of race or color of plaintiff, or any other minor Negro incompetent citizen, or in any manner hindering such admission, care or treatment, to be unconstitutional and void.

(d) That the court enter a preliminary injunction restraining and enjoining the defendants and their successors in office from enforcing, executing or pursuing against the plaintiff, or any other Negro mentally incompetent citizen of the state, any statute, policy, practice, custom or usage, as alleged in the complaint, or from promulgating, adopting, enforcing, issuing or pursuing against the plaintiff or any other minor Negro mentally incompetent citizen of the state any policy, practice, custom or usage which denies or prohibits him, because of race or color, from being admitted to and receiving the same or equal care or treatment afforded to all non-Negro, racial, cultural or ethnic groups within the state.

On July 15, 1954, the defendants answered admitting the jurisdiction of the court and the allegations with respect to the official capacities of the defendants. The answer denied that the Superintendent of the State Hospital at any time denied or refused admission of the plaintiff to the State Hospital because of his race or color. The answer further denied that any official of the State Hospital, at any time mentioned in the complaint, acted detrimental to or violative

of the rights and privileges of the plaintiff or any other minor incompetent Negro. The answer denied that the State Hospital is obliged to admit as patients all insane persons who are citizens or residents of the State of Arkansas unconditionally, but states that the Superintendent of the State Hospital has discretion in the matter of accepting patients beyond the maximum capacity of the State Hospital.

Answer further denies specifically allegations 12 and 13 in the complaint which relate to the allegation that the hospital has facilities devoted to the care of non-Negro minor incompetents which are denied the plaintiff and other minor Negro incompetents.

Under the provisions of the pre-trial order made on October 8, 1954, there was introduced in evidence the list of patients received at the State Hospital, under the age of 15 at the time of admission, from January 1, 1945, to date. This list is summarized as follows:

**1945**

| White Male | 34 | White | 51 | |
|---|---|---|---|---|
| Negro Male | 14 | Negro | 15 | 22.7% |
| White Female | 17 | Total | 66 | |
| Negro Female | 1 | | | |
| Total | 66 | | | |

**1946**

| White Male | 22 | White | 35 | |
|---|---|---|---|---|
| Negro Male | 11 | Negro | 16 | 31.4% |
| White Female | 13 | Total | 51 | |
| Negro Female | 5 | | | |
| Total | 51 | | | |

**1947**

| White Male | 24 | White | 42 | |
|---|---|---|---|---|
| Negro Male | 14 | Negro | 19 | 31.1% |
| White Female | 18 | Total | 61 | |
| Negro Female | 5 | | | |
| Total | 61 | | | |

**1948**

| White Male | 36 | White | 54 | |
|---|---|---|---|---|
| Negro Male | 13 | Negro | 22 | 28.9% |
| White Female | 18 | Total | 76 | |
| Negro Female | 9 | | | |
| Total | 76 | | | |

**1949**

| White Male | 32 | White | 51 | |
|---|---|---|---|---|
| Negro Male | 10 | Negro | 18 | 26.1% |
| White Female | 19 | Total | 69 | |
| Negro Female | 8 | | | |
| Total | 69 | | | |

**1950**

| White Male | 18 | White | 34 | |
|---|---|---|---|---|
| Negro Male | 4 | Negro | 16 | 32% |
| White Female | 16 | Total | 50 | |
| Negro Female | 12 | | | |
| Total | 50 | | | |

1951

| | | | | |
|---|---|---|---|---|
| White Male | 15 | White | 26 | |
| Negro Male | 5 | Negro | 8 | 23.5% |
| White Female | 11 | Total | 34 | |
| Negro Female | 3 | | | |
| Total | 34 | | | |

1952

| | | | | |
|---|---|---|---|---|
| White Male | 21 | White | 33 | |
| Negro Male | 4 | Negro | 11 | 25% |
| White Female | 12 | Total | 44 | |
| Negro Female | 7 | | | |
| Total | 44 | | | |

1953

| | | | | |
|---|---|---|---|---|
| White Male | 21 | White | 32 | |
| Negro Male | 5 | Negro | 9 | 21.9% |
| White Female | 11 | Total | 41 | |
| Negro Female | 4 | | | |
| Total | 41 | | | |

1954 (1–1–54 to 10–8–54)

| | | | | |
|---|---|---|---|---|
| White Male | 10 | White | 15 | |
| Negro Male | 2 | Negro | 4 | 21% |
| White Female | 5 | Total | 19 | |
| Negro Female | 2 | | | |
| Total | 19 | | | |

A number of witnesses testified before the court, including Daisy Essex, the grandmother of the incompetent minor; Dr. E. H. Crawfis, Superintendent of the State Hospital; John H. Biggs, Sheriff of Chicot County; Tom D. Davis, Assistant City Editor of one of the Little Rock newspapers; Dr. Bennett, Dr. Crow and Dr. Carnahan, members of the staff of the State Hospital; Dr. Earl Parsons and Dr. John W. Elliott, the latter two of whom qualified as expert witnesses in the field of psychiatry.

The child's grandmother described the child as being practically helpless because of his mental deficiency. He understands very little, or perhaps none, of the English language and is unable to distinguish hot from cold. He apparently knows what an apple is when shown and given one but cannot understand commands with respect to his individual conduct. His grandmother testified that he had to be confined, or if permitted to be outside a room would have to be tied or chained to keep him from straying away or injuring himself.

Dr. Crawfis, over the objection of the plaintiff's attorneys, in answer to a hypothetical question detailing the condition of the minor incompetent, testified that his intelligence quotient was at the most only 25 and that he was of the opinion that his mentality did not exceed that of a child three or four years of age.

The sheriff testified that he took the minor incompetent, together with the Order of Committal, to the State Hospital on July 17, 1953, and that the State Hospital authorities would not receive the child, but that he was told that they had no place for the child except with older Negro men. Mr. Davis testified that at the time the child was brought to the State Hospital he talked to Dr. Odom who was Superintendent of the State Hospital, and that Dr. Odom said that at that time there were no facilities for Negro children.

Dr. Bennett and Dr. Crow testified relative to the treatment of the different inmates in the hospital and especially the Negro patients. Dr. Bennett's ward had minor female patients where there was one 15 year old boy who had been helpless since a baby and had to be fed and cared for at all times. Dr. Crow's ward had colored male adult patients, with the exception of four or five minor male patients for whose protection safeguards were set up and maintained.

Dr. Carnahan, who was in charge of the receipt of patients on both days when the plaintiff was brought to the institution, testified that he was not admitted because there were no beds or facilities available for receiving him. Dr. Parsons and Dr. Elliott both testified respecting the question of segregation of Negro patients within the hospital. The testimony of both of these doctors related to the question of the necessity or desirability of segregating the races in an institution designed to treat mental patients. Both of these doctors were of the opinion that the segregation of patients in a State Hospital for Nervous Diseases was not necessary in the treatment of the patients, and one of them was of the opinion that nonsegregation would be definitely advantageous.

After the trial of the case on December 13, 1954, counsel were asked to file requested findings of fact and conclusions of law and briefs in support thereof. They have done so, and these proposed findings and briefs have been carefully considered by the court.

The case presents for consideration and answer the following questions:

1. Is the Plaintiff in a Position to Maintain this Suit?

2. Were the Legal and Constitutional Rights of the Plaintiff Violated in the Refusal to Admit Him to the State Hospital?

3. Are the Legal and Constitutional Rights of the Plaintiff Violated in the Practice of Segregation in the State Hospital?

I.

It is the argument of the defendants that the plaintiff was not qualified for admission as a patient in the State Hospital, and it is said that since the proof heard by the court established the plaintiff as being mentally defective rather than a person having psychosis, he could not be admitted.

The Order of the Chicot County Probate Court which was made on July 15, 1953, has been hereinabove set out in full. This order shows that a doctor of the town of Dermott, which the court takes notice is in Chicot County, Arkansas, certified that the plaintiff was so suffering from mental disease or psychosis as to need hospitalization and that he was dangerous to society and to the nearest relatives. The court further recites that upon oral testimony duly heard it found that the plaintiff was so suffering from mental disease or psychosis as to require mental treatment.

Act 241 of the Acts of 1943, Sections 59-229 to 59-242, Inclusive, Ark.Stat. 1947, is a comprehensive statute enacted under the following title:

"An Act to Prescribe Rules as to Who May Be Admitted to the State Hospital, the Method of Admission, Transfer of Patients, Pay for Maintenance of Patients, Discharge of Patients, to Repeal All Laws of Conflict Herewith, and for Other Purposes."

This act provides as follows:

"* * * If any Health Officer, or any regularly licensed and practicing physician believes that any person residing in the county, who is not a patient in the State Hospital, is so suffering from mental disease as to be dangerous to himself or to society and such person cannot be taken peaceably to the State Hospital as provided in other Sections of this Act, then such Health Officer or Physician shall certify this fact to the Judge of the Probate Court of such county for a hearing, copies of such certification to be delivered to the person affected thereby, or to

his guardian, or to his nearest relative, if any, whereupon said Court shall hold a hearing either in regular term or in vacation in chambers, receiving such evidence as may be offered by all parties interested, after which he shall, if the evidence justifies, issue an order of commitment to the State Hospital." Section 6, Act 241, Acts of 1943; Section 59–234 Ark.Stat.1947.

The Probate Court of Chicot County was regularly acting pursuant to the provisions of the statute above quoted. It unquestionably had jurisdiction to so act.

■ The judgments, orders and decrees of the Probate Court upon a subject matter and between parties over which it has jurisdiction cannot be collaterally questioned. Borden v. State, 11 Ark. 519; West v. Waddill, 33 Ark. 575; Mays v. Rogers, 37 Ark. 155; Carraway v. Moore, 75 Ark. 146, 86 S.W. 993; Branch v. Veterans Administration, 189 Ark. 662, 74 S.W.2d 800; Levinson v. Treadway, 190 Ark. 201, 78 S.W.2d 59.

It is true that over the objections of the plaintiff the defendant introduced testimony clearly showing that the incompetent Negro minor, plaintiff in this case, was a mentally deficient person rather than one suffering from a psychosis and that he was incurable.

■ However, the testimony was incompetent and cannot be considered by the court, for the court is bound by the order made by the Judge of the Chicot County Probate Court, and the order must remain binding upon all persons interested therein until it is set aside under proper procedure.

■ It appears, therefore, that the first question above posed must be answered in the affirmative. Not only is the plaintiff entitled to maintain this suit in his own right, but under the provisions of Rule 23(a) of the Rules of Civil Procedure, the plaintiff has properly stated a cause of action in a class suit. A class suit may be maintained

when the right sought to be enforced for or against the class is:

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

As is indicated, the court is of the opinion that the plaintiff is a member of a "spurious class" who allege that they have been adjudged to be entitled to admission to the State Hospital as persons suffering from a psychosis and have been denied the right of admission. McDaniel v. Board of Public Instruction for Escambia County, Florida, D.C., 39 F. Supp. 638; Neiman–Marcus v. Lait, D. C., 13 F.R.D. 311.

In passing, however, it should be noted that the controversy growing out of the failure to admit the plaintiff is largely academic, for it is provided in Section 4 of said Act 241 of the Acts of 1943 that:

"If, after the admission and examination by the staff the Superintendent shall find that such patient is without psychosis, therefor (sic) not suitable for care and treatment in the State Hospital, he shall promptly discharge the patient, after having notified the Health Officer or Physician of such finding." Ark.Stats. § 59–232.

It appears practically undisputed that the plaintiff is simply a mental deficient and without psychosis. Therefore, if this action had been taken by the authorities at the State Hospital, the question of whether or not he had the right to be admitted would have passed out of the case.

## II.

Section 1 of said Act 241, Section 59–229 Ark.Stat.1947, provides as follows:

"Who May Be Admitted. Any citizen or resident of the State of Arkansas who shall become mentally ill and in need of hospitalization for such illness shall be admitted to the State Hospital for diagnosis, care and treatment. Also any non-resident within the State who may become mentally ill and in urgent need of immediate hospitalization shall be admitted to the State Hospital for temporary treatment, until such time as the place of his residence may be determined and his transfer thereto may be accomplished. The superintendent shall use his discretion as to accepting patients beyond the maximum capacity of the State Hospital. In all cases, admissions shall be in accordance with the rules hereinafter set out."

It must be observed that under this section, "The Superintendent shall use his discretion as to accepting patients beyond the maximum capacity of the State Hospital". It was in evidence that Dr. Odom, who was the Superintendent of the State Hospital on July 17, 1953, stated in effect that there were no facilities at that time for Negro children. It cannot be contended that the admission of the plaintiff was denied because of his race, for it is in evidence that Negro children have been, since the passage of this Act, regularly received. During the period of time covered by the analysis, from 1945 to 1954, 138 Negro children have been received as patients in the State Hospital.

Dr. Carnahan positively testified that at both times when the plaintiff was brought to the hospital he was refused admission because no beds were available. He further testified that at the same time no beds were available for white incompetent children. Certainly this did not constitute a denial of admission on account of the race of the plaintiff.

The Arkansas State Hospital was originated by an Act of the General Assembly of April 19, 1873. The name of the institution was changed from that of the Insane Asylum to State Hospital by Act 240 of the Acts of 1933, and the complete management and control of the State Hospital with power to make, promulgate and enforce rules and regulations for the conduct of the institution and of the patients therein were vested in the State Hospital Board by the terms of the last mentioned act, and this Board was directed to appoint a Superintendent who should at all times be responsible to the Board for the proper care and skillful treatment of the patients as well as the efficient economic and businesslike management of the affairs of the Hospital. The Superintendent, by the terms of said Act, is required to take and file in the office of the Secretary of State an oath to support the Constitution and laws of the State of Arkansas and to faithfully perform the duties imposed upon him.

There can, therefore, be no question that the Superintendent of the State Hospital is an officer of the State and the review of his acts by the court may be said to be generally controlled as follows:

"Sec. 255. Judicial Review of Official Acts.—Where a statute gives a discretionary power to an officer to be exercised by him upon his own opinion of certain facts, he is the sole and exclusive judge of the existence of those facts; the courts will not attempt to interfere with or control the exercise of his discretionary powers, in the absence of any controlling provisions in the law conferring the power. The fact that the exercise of a power may be abused is not a sufficient reason for denying its existence. Thus, it is a firmly established rule, as stated in other articles in this work, that the judiciary will not interfere with executive officers in the performance of duties which are discretionary in their nature or involve the exercise

of judgment. Although courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of the acts of public officers, after the matter has once passed beyond their control there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of that judgment while the matter is properly before him for action. The reason for this is that the law reposes this discretion in him for that occasion, and not in the courts. For example, the President of the United States is invested with certain political powers in the exercise of which he is to use his own discretion, and for which he is not accountable to the courts. And even where a court, in the exercise of its jurisdiction, reviews the discretionary act of a public officer, the decision of the officer will not be disturbed in the absence of a showing of an abuse of discretion or an arbitrary decision, or such fraud or corruption as vitiates the action taken." 43 Am.Jur.

██ There seems to be no division of authorities on the principle that when a duty is imposed by law upon an officer to perform an act within his discretion, the court is without power to interfere with or set aside the action of the officer, unless there was an abuse of discretion or an arbitrary action. Jernigan, Bank Commissioner v. Loid Rainwater Company, 196 Ark. 251, 117 S.W.2d 18; Rural Special School District v. Common School District, 183 Ark. 329, 35 S.W.2d 587; St. Louis S. W. Railway Company v. Stewart, 150 Ark. 586, 235 S.W. 1003; U. S. v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L. Ed. 1259; Nishimura Ekin v. U. S., 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146. It is seen, therefore, that the answer to the second question posed must be answered in the negative.

██ There is absolutely no testimony that would support the charge that the plaintiff was denied or will be denied admission to the State Hospital on account of his race. His denial of admission amounted to an official act of the Superintendent in the use of his discretion as to accepting patients beyond the maximum capacity of the State Hospital. At the times he was brought to the hospital that maximum capacity had been reached and there were no facilities for accepting minor patients, either white patients or Negro patients.

### III.

It is charged by the plaintiff that the question of segregation of the races among the patients in the State Hospital was drawn into the case by a gratuitous argument on behalf of the defendant that it is necessary in the interest of their own health and safety that white and Negro patients be separated during the period of their psychiatric treatment.

The complaint, which has been digested at the beginning of this opinion, did not raise the question of the illegality or unconstitutionality of segregation of the patients receiving treatment in the State Hospital. On October 20, 1954, defendants filed a memorandum of law in which point No. 1 was designated as "The Segregation of White and Negro Infant Patients in the State Hospital is legal". The point was developed at some length, and it was endeavored to distinguish the principles and rules applicable in the segregation of patients suffering with mental disorders from the principles and rules applicable in schools and universities. On November 5, 1954, plaintiff answered this argument in his memorandum of law containing subjects designated "State Agencies cannot Segregate Without Benefit of Statute", "Segregation by State is in Violation of the Equal Protection of the United States Constitution" and "Segregation by State is in Violation of the Due Process Clause of the United States Constitution".

All of these points were argued at length, and as has been pointed out, some testimony was taken regarding that issue.

240

It is true that there was no objection on the part of the plaintiff to bringing the controversy into the case relative to segregation of patients. It is also true that this matter was improperly brought into the case and cannot be considered by the court.

The action maintained by the plaintiff, both as an individual and as a member of a class, does not bring this question before the court. In fact, as a class suit it could only be brought by one who is in a position to show that he is a member of a class who have been denied some right by reason of segregation. The plaintiff, of course, possesses no such right individually, because he is not now, and has never been, a patient in the State Hospital.

It is unnecessary to again point out the provisions of Rule 23 limiting the bringing of class actions to those who can classify thereunder.

The court must, therefore, hold that the complaint of the plaintiff should be dismissed.

